[No. 1161-1.   Division One—Panel 1.   June 25, 1973.]

EDWIN HAMILTON *et al.*, *Respondents*, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, *Appellant*.

*Skeel, McKelvy, Henke, Evenson & Betts, R. L. Gemson,* and *Alfred McBee,* for appellant.

*Voris & Lipscomb* and *Michael C. Lipscomb,* for respondents.

WILLIAMS, J.—This action was brought by Edwin Hamilton and his wife, the insured, to recover damages from State Farm Mutual Automobile Insurance Company, the insurer, and Frederick V. Betts, an attorney, because of a judgment taken against the Hamiltons which was in excess of the policy limits in a liability insurance contract. In its answer, State Farm denied liability and affirmatively pleaded a release. A voluntary nonsuit was entered dismissing Betts from the case. The cause was tried to a jury, which returned a verdict of $35,000 for the Hamiltons. From the judgment entered upon the verdict, State Farm appeals.

The policy which State Farm issued to the Hamiltons limited liability to $10,000 for injury to one person and provided that in the event an action was brought against the insured for a claim within the scope of the policy, it, State Farm, would undertake the defense. An action within such scope but far in excess of the policy limits was commenced against the Hamiltons by the legal representative of a 6-year-old boy who was injured when a vehicle driven by Mrs. Hamilton struck him. Trial of the action resulted in a verdict for the defense. On appeal, a new trial was ordered, *Seholm v. Hamilton,* 69 Wn.2d 604, 419 P.2d 328 (1966) and this time the jury returned a verdict of $45,000 for the plaintiff. The Hamiltons then signed a document releasing State Farm from liability and State Farm paid $10,000 and costs into the registry of the court. Notice of appeal, later abandoned, was filed.

In this action, the Hamiltons sought to recover from State Farm the sum of $35,000, which was the difference between the $45,000 judgment entered against them in the *Seholm* case and the $10,000 which State Farm paid thereon. The jury received evidence as to the conduct of the defense by Betts, the circumstances of settlement negotiations conducted by the attorneys for the parties, the opinion of experts upon the value of the boy's claim and a lawyer's duty in the circumstances, and the release. There is no real contention that Betts did not prepare for and conduct the two trials and the appeal with skill and resourcefulness. The Hamiltons, through their counsel, concede as much.

The controlling question is whether the Hamiltons were fairly represented by Betts in connection with the settlement negotiations. Canon 8 of the Canons of Professional Ethics, in effect at the time in question, in part reads:

> A lawyer should endeavor to obtain full knowledge of his client's cause before advising thereon, and *he is bound to give a candid opinion of the merits and probable result of pending or contemplated litigation. . . . Whenever the controversy will admit of fair adjustment, the client should be advised to avoid or to end the litigation.*

(Italics ours.)

Two lawyers called as experts by the Hamiltons testified that this canon applied to Betts in his conduct of the Hamilton defense in the *Seholm* case. One of them said:

> The standards that pertain in this situation are that, one, you must at all times keep your client advised as to any settlement offers received. And more than that, you must give your client your candid and well thought out recommendations with respect to such settlement offers. That is part of the canon, part of the duties of a lawyer.

■ *Tyler v. Grange Ins. Ass'n*, 3 Wn. App. 167, 473 P.2d 193 (1970) is pertinent upon the question of settlement negotiations conducted by one lawyer representing both insurer and the insured. There, it is said at page 177:

> The conclusion reached by a growing number of cases

is both the interests of the insured and the insurer must be given equal consideration and the only practical test by which to apply this standard is to have the insurer consider the total risk in deciding whether or not to accept a settlement offer, without regard to who is bearing what portion of that risk.

In the absence of a holding by our state that application of the fiduciary obligation principal demands a conclusion there is strict liability on the part of the insured, we adopt the "no limit" test as the best means of determining whether the interests of the insurer and the insured have been given equal consideration. This rule should be applied whether the insurer is being judged by either a negligence or good faith standard. This is supported in Appleman, at § 4712, where he states:

> The insurer's duty to act diligently and in good faith extends up to the full limits of the policy and beyond. Good faith requires that the insurer make its decision as to settlement or defense of the suit as if no policy limit of liability existed, . . .

(Footnotes omitted.)

State Farm contends that Betts did perform the duty required of him by the canon; that he did inform the Hamiltons of the State Farm offer which was maintained at $2,500 throughout and of the Seholms' offers of $10,000, $7,500 and $5,000. The evidence is not clear upon just how much discussion the Hamiltons and Betts had with reference to an adjustment of the Seholm claim to end litigation. Communication between State Farm and Betts is well documented, but as between the Hamiltons and Betts, it was mostly oral except for comments such as, "case could not be settled for anything less than the full amount of the policy . . ." and "[w]e have offered to pay the plaintiff $2500.00, but that offer has been refused." and "[w]e have been trying to arrive at a settlement but at this time it appears that a settlement is very unlikely." in letters which Betts wrote to the Hamiltons telling them about the preparation of the case and confirming appointments.

The two lawyers who were called as experts testified that, in their opinion, there was sufficient evidence of liabil-

ity to take the *Seholm* case to the jury, and that any verdict returned against the Hamiltons would be very substantial because of the seriousness of the boy's injuries. One of the witnesses said that the probable verdict value was between $55,000 and $60,000 if there were clear liability and the case had a settlement value of about $25,000 when the element of questionable liability was considered. The other witness placed a $70,000 to $75,000 probable verdict value if there were clear liability and valued the claim at $30,000 when the element of liability was considered. It is significant, therefore, that Betts testified that, in evaluating the Seholm claim, he never did put a dollar amount upon the size of verdict the Hamiltons could expect if judgment was entered against them.

Also, it is important that there is no evidence that the Hamiltons were consulted concerning the settlement posture which they and State Farm were assuming. The documentary evidence is very strong that State Farm and Betts decided early in the negotiations that $2,500 was all that should be offered, and that that one offer was the only one advanced on behalf of the Hamiltons throughout the litigation. Although, as seen, the Hamiltons were told of the position taken by their insurance carrier and their attorney, it does not appear that at any time they were included in the settlement discussions or decisions. Both of the Hamiltons denied having been told of Seholm's offers of settlement for $5,000 and $7,500. Betts testified that he did not tell Mrs. Hamilton, with whom he had the most contact, that if the case were not settled she could very possibly suffer a loss of several thousand dollars.

Upon the evidence, the jury could reasonably determine that State Farm and Betts conducted settlement negotiations on the basis of limited coverage, rather than on a balancing of the probabilities of a defendant's verdict against the near certainty of a large award for the boy's injuries if the boy prevailed. There was substantial evidence from which the jury could determine that the Hamiltons were not well served by their lawyer, and that the

failure of their lawyer properly to advise and represent them in connection with the settlement negotiations was a proximate cause of their incurring a judgment debt of $35,000.

State Farm contends that the Hamiltons could have retained their own lawyer if they had wished, and that they were told on several occasions that they had that right. Of course, they did have that right, but the insurance coverage was that State Farm would:

> defend any suit against the insured alleging such bodily injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient.

Betts had been representing State Farm for 30 years and was its acknowledged agent in the *Seholm* case. That did not prevent him from representing the Hamiltons, of course, unless his association with State Farm prevented him from doing so properly. If, for that reason, Betts could not represent the Hamiltons as the law required him to do, then it was incumbent upon State Farm to furnish them an attorney who could do so.

In this connection, we observe that Betts undoubtedly discharged his professional duties to State Farm in a completely satisfactory manner. In doing so, he could not, or did not, or the jury was justified in finding that he could not, or did not, provide equally loyal service to the Hamiltons. It may very well be that under the circumstances it was humanly impossible for one lawyer to represent both State Farm and the Hamiltons.[1] Nevertheless, as seen, the Hamiltons were entitled to the undivided loyalty of the attorney representing them. The jury determined upon substantial evidence that the Hamiltons suffered damages because of shortcomings in the legal representation which

---

[1] During oral argument to this court, Hamiltons' counsel remarked that Betts "was a victim of the system."

State Farm supplied to them. State Farm is therefore liable.

Fourteen of State Farm's assignments of error pertain to the giving or the failure to give instructions. All of these assignments concern the submission to the jury of the issue of malpractice of a professional man. Instruction No. 16 reads:

> A lawyer employed by the insurer to represent the insured owes the insured undivided loyalty. Where an insurer's attorney has reason to believe that the discharge of his duties to his cleint [sic], the insured, will conflict with his duties to his employer, the insurer, it becomes incumbent upon him to terminate his relationship with the insured.

The Canons of Professional Ethics in effect at the time provided that:

> It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

CPE 6.

■ Instruction No. 16 was undoubtedly taken from *Van Dyke v. White*, 55 Wn.2d 601, 349 P.2d 430 (1960), and correctly so. It may be that the jury should also have been instructed that under the circumstances Betts could have continued to represent both parties if he had made a full disclosure to each of them and received their consent. Apparently this solution would be permissible under the canon above quoted although it is unrealistic to believe that Betts, who was, in effect, the "house counsel" for State Farm, could give his undivided loyalty to the Hamiltons while in that relationship with State Farm. In any event, the point cannot be successfully raised on appeal because the exception taken by State Farm to the instruction was that there was no evidence of any circumstances which would require Betts to withdraw or terminate his relationship with the Hamiltons. To the contrary, there was ample

evidence in that regard. Only those claims of error in instructions which are first brought to the attention of the trial court can be considered on appeal because the trial court does not commit error if it does not rule on a question not put before it. *Cunningham v. Tieton*, 60 Wn.2d 434, 374 P.2d 375 (1962); *Myers v. Ravenna Motors, Inc.*, 2 Wn. App. 613, 468 P.2d 1012 (1970).

■ It is unnecessary to consider the remaining assignments of error to the instructions because those given properly submitted the issues to the jury.

There is one other concern—that of the document which the Hamiltons signed releasing State Farm from "any possible claim we might have against it on the basis of bad faith for not having settled the case prior to the second trial." After judgment on the verdict was entered against the Hamiltons for $45,000, Betts went to their home with the release. He told them that he had recommended to State Farm that no appeal be taken, although they—the Hamiltons—had a right to appeal if they wished. He further told them that the judgment creditor (Seholm) had offered to release State Farm from any sum over the policy limits upon application of the amount of those limits upon the judgment. Betts asked the Hamiltons to sign the release, which they did.

■ State Farm contends that the Hamiltons benefited from the signing of the release because it meant that the policy limits would be paid on the judgment, State Farm would lose its right to appeal, and the case would be disposed of. At that time, State Farm had been advised by Betts not to appeal, it was legally obligated to pay the policy limits, and instead of the case being disposed of, the Hamiltons were left with a $35,000 judgment against them. There was no consideration for the release, and they should not have been advised to sign it.

Affirmed.

JAMES, J. (concurring)—I concur with Judge Williams' opinion that the judgment should be affirmed. While I

agree with Judge Horowitz that State Farm's requested instruction No. 9 correctly states that State Farm's duty to inform was limited to reasonably material and significant matters, I am satisfied that it was not prejudicial error to refuse the instruction.

As the jury was told by instruction No. 11, State Farm acted through Mr. Betts, the attorney whom it employed to represent the Hamiltons. And as stated in instruction No. 12, Mr. Betts was charged only with the duty to act as a "reasonably careful attorney" and to exercise only "ordinary" care. When read together, the instructions afforded State Farm full opportunity to argue that Mr. Betts' duty to inform applied "only to reasonably material and significant matters."

I am also in agreement with Judge Horowitz that instruction No. 16 is not a correct statement concerning an insurance lawyer's duty when caught in a conflict of interest situation. But I am nevertheless satisfied that when, as required by instruction No. 1, the instructions are "considered as a whole," the giving of instruction No. 16 did not constitute prejudicial error. The jury was instructed that the basis of the Hamiltons' claim was that State Farm refused a reasonable settlement offer within the policy limits, not that the attorney employed to represent them failed to terminate his relationship when an apparent conflict of interest developed.

In any event, I am satisfied that State Farm's exception to instruction No. 16 was inadequate to preserve a claim of error. The exception stated was only that "there is simply no evidence upon which to base the instruction." To preserve claimed error, an exception "must specifically point out and inform the trial court 'of the points of law and questions of fact in dispute,' in order to have the questions reviewed . . ." *Gattavara v. General Ins. Co. of America,* 166 Wash. 691, 698, 8 P.2d 421 (1932).

HOROWITZ, C.J. (dissenting)—I agree the trial court was required to submit this case to the jury on the issues of

negligence and want of good faith in the sense required. When an insurer, in conformity with its liability insurance policy, takes over the insured's defense of a claim insured against, the claim being for an amount in excess of policy limits, the insurer must exercise " 'that degree of skill, judgment, and consideration for the welfare of the insured which it, as a skilled professional defender of lawsuits having sole charge of the investigation, settlement, and trial of the suit' " would be reasonably expected to utilize. *See* 7A J. Appleman, *Insurance Law & Practice* § 4712, at 562 (1942). Liability may rest on negligence, lack of good faith, or both. *See Murray v. Mossman,* 56 Wn.2d 909, 355 P.2d 985 (1960); *Evans v. Continental Cas. Co.,* 40 Wn.2d 614, 245 P.2d 470 (1952); *Tyler v. Grange Ins. Ass'n,* 3 Wn. App. 167, 172-73, 473 P.2d 193 (1970). Appleman, in discussing the good faith concept in this field, has recently illustrated what is meant:

> "Lack of good faith" in settlement negotiations or in conduct of defense by insurer is the equivalent of "bad faith," and "bad faith" embraces more than bad judgment or negligence and imports dishonest purpose, moral obliquity, conscious wrongdoing, breach of known duty through some ulterior motive or ill will partaking of the nature of fraud, and embraces actual intent to mislead or deceive another.

7A J. Appleman, *supra* § 4712, at 368 (Supp. 1973).

The defense taken over may require the insurer to appoint an attorney to defend the interests both of the insured and insurer. If the insurer fails to render the required performance, the insurer becomes liable for resulting loss. Liability may exist for an amount in excess of policy limits regardless of whether the insured has paid or can pay the excess liability. *Murray v. Mossman, supra.* The attorney appointed, in performing his duties, to act in good faith must give equal consideration to the interests of the insured and the insurer. Accordingly, he must handle the claim as if there were no policy limits. *Tyler v. Grange Ins. Ass'n, supra.* Due care and good faith require that the insured be kept informed of any offer of settlement made

by the claimant, especially if within policy limits. *E.g.,* *Ging v. American Liberty Ins. Co.,* 423 F.2d 115 (5th Cir. 1970); *Baker v. Northwestern Nat'l Cas. Co.,* 26 Wis. 2d 306, 132 N.W.2d 493 (1965); *Kinder v. Western Pioneer Ins. Co.,* 231 Cal. App. 2d 894, 42 Cal. Rptr. 394 (1965); 7A J. Appleman, *Insurance Law & Practice* § 4712, at 572, 573 (1942), § 4712, at 373, 374, 380, 384 (Supp. 1973). The appointed attorney, both as attorney for the insured and as the insurer's agent, must adequately advise the insured on settlement offers received.

In the instant case, Mr. Betts, the appointed attorney, testified he informed both the insured and the insurer of a $5,000 and a $7,500 offer of settlement and advised both the insured and the insurer that in his opinion there was no liability to justify more than the $2,500 offer of settlement. Plaintiffs testified, however, that they had not been informed on or concerning the two offers, although Mrs. Hamilton had expressed to Mr. Betts her hope that he could settle the case outside of court. She further testified that had the offers been mentioned to her, she would have gladly consented to the acceptance of the offers by the insurer. The disputed testimony concerning the communication of settlement offers, coupled with the insurer's knowledge of the facts underlying the claim and the insured's willingness that the claim be settled within policy limits, required that the case go to the jury to resolve the factual issues of good faith, negligence and proximate cause. *Lysick v. Walcom,* 258 Cal. App. 2d 136, 65 Cal. Rptr. 406, 28 A.L.R.3d 368 (1968); *Tyger River Pine Co. v. Maryland Cas. Co.,* 170 S.C. 286, 170 S.E. 346 (1933); 7A J. Appleman, *Insurance Law & Practice* § 4713, at 585-86 (1942). The nondisclosure of the settlement offers and the resulting failure to advise thereon, all as testified to by the plaintiffs even though disputed by the defendant, also raised a jury question on the issue of validity of the release. 76 C.J.S. *Release* § 27, at 653 (1952).

I agree with defendant, however, that the court erred to defendant's prejudice in giving instruction No. 16 and re-

fusing defendant's proposed instruction No. 9. Instructions No. 3 and 4 summarized the claims of the respective parties. Plaintiffs claimed defendant was guilty of bad faith and negligence in various respects, including:

1. Failure to keep plaintiffs fully advised as to all developments, including the offer of $5000.00 in settlement and the offer of $7500.00 to settle on behalf of the injured minor child;

2. To fully disclose the case and all of its ramifications and possibilities to the plaintiffs; . . .

Instruction No. 4 informed the jury of defendant's denial of plaintiffs' claims. This was accompanied by an affirmative claim:

1. That plaintiffs were kept fully informed of all aspects of the tort litigation.

The jury was first instructed on the plaintiffs' theory of the case. Included in the instructions given was an instruction that defendant was liable for any act or omission of its attorney and agent, Mr. Betts. Negligence was defined to include "the failure to exercise ordinary care." An instruction stated that an insurance company voluntarily undertaking a defense against a claim insured against "assumes a position of trust and confidence which calls for an exercise of the utmost good faith, particularly in view of the possible conflict of interest between the insurer and the insured." Instruction No. 13. The jury was told that the duty of the attorney employed by an insurance company "to represent the company and its insured in the defense of a claim . . ." created "an attorney-client relationship in which the law requires that the lawyer conduct himself as if his client either (1) had no insurance or (2) as if the insurance policy has no limits." The no-limit test, it was explained, affords "the best means of determining whether the interests of the insurer and the insured have been given equal consideration." The jury was further informed that "[i]f the company through its attorney deviates from this standard and such deviation results in a loss to the insured, whether it be a result of negligence or bad faith," the

insurer must compensate the insured for his loss. The jury was instructed that the absence of good faith "does not necessarily connote or imply dishonesty, misrepresentation, deceit, or a species of fraud, but that the defendant did not give equal weight to the plaintiffs' interest." Instruction No. 15. The jury was also instructed that the lawyer appointed owes the insured "undivided loyalty," that if the insurer's attorney "has reason to believe that the discharge of his duties to his client, the insured, will conflict with his duties to his employer, the insurer, it becomes incumbent upon him to terminate his relationship with the insured." Instruction No. 16.

The court then instructed the jury on the theory of the defendant's case. These instructions stated that the defendant would not necessarily be liable for mere error in judgment in not settling a case within the policy limits; that "the mere fact that the insurance company was unsuccessful in the trial of a case does not in itself show the defense was made not in good faith"; that an attorney, in evaluating the case and in determining whether the case should be settled or litigated, "is not endowed with or expected to have the gift of prophecy so as to . . . predict . . . the verdict . . ." (instruction No. 17); that an insurer under a liability insurance policy "has no absolute duty under any and all circumstances whatever to settle the claims made against" its insureds; that an insurer may litigate "if reasonably and in good faith the insurer believes that a bona fide issue of liability or damages exists." Instruction No. 18.

Two instructions were given on the law applicable to releases: One on consideration, and another that "a person occupying a fiduciary relationship [must] exercise the utmost fairness and good faith in . . . the obtaining of a release from the beneficiary," and "a release executed in the absence of the exercise of that degree of good faith will be void." The court then instructed that "If you find for the plaintiffs your verdict will be: $35,000.00 at 6% from May 31, 1967." (Instruction No. 21.)

It is against this background of instructions that defendant proposed instruction No. 9 reading as follows:

> An insurer is under a duty to keep an insured reasonably informed of the course of the litigation which it is defending for him, including the progress it has made in locating and interviewing witnesses and the nature of the settlement negotiations in which it has been involved. An insurer's duty to keep the insured informed applies only to reasonably material and significant matters.

Plaintiffs contend the instruction "was basically immaterial to this particular lawsuit . . ." I cannot agree with this contention. It has already been pointed out that the defendant denied plaintiffs' claim that it failed "to keep plaintiffs fully advised as to all developments, including the offer of $5000.00 in settlement and the offer of $7500.00 to settle," and in failing to "fully disclose the case and all of its ramifications and possibilities to the plaintiffs." Indeed, defendants claimed that "plaintiffs were kept fully informed of all aspects of the tort litigation." None of the instructions, however, dealt specifically with the nature and limitations of the insurer's duty to keep the insured reasonably informed of the course of the litigation, nor did any of the instructions given point out that the insurer's duty to keep the insured informed "applies only to reasonably material and significant matters."

In a jury trial, each party is entitled to a fair and adequate instruction on the rules of law applicable to his theory of the case. Hence, it has long been held that it is reversible error for a court to refuse to give a party's requested instructions required to set forth his theory of the case if the instructions given are not adequate for that purpose. *Hester v. Watson,* 74 Wn.2d 924, 448 P.2d 320 (1968); *Harris v. Fiore,* 70 Wn.2d 357, 423 P.2d 63 (1967); *Dabroe v. Rhodes Co.,* 64 Wn.2d 431, 392 P.2d 317 (1964). Other cases to the same effect are cited in the margin.[2] In

---

[2]*Carraway v. Johnson,* 63 Wn.2d 212, 386 P.2d 420 (1963); *Kelsey v. Pollock,* 59 Wn.2d 796, 370 P.2d 598 (1962); *Lidel v. Kelly,* 52 Wn.2d 238, 324 P.2d 817 (1958); *DeKoning v. Williams,* 47 Wn.2d 139, 286 P.2d 694 (1955); *Chilberg v. Parsons,* 109 Wash. 90, 186 P. 272 (1919);

determining whether instructions given are adequate, the instructions must not be so general that they will be reasonably capable of being misunderstood by an average person who is not ordinarily legally trained. A general instruction using terms such as "good faith," "utmost good faith," "bad faith," "undivided loyalty," may be clear to a legally trained mind even though the terms used bear more than one meaning.[3] The instruction may not be so clear to a layman who has not had the benefit of legal research required to understand the terms used. General instructions are not necessarily adequate. *Dabroe v. Rhodes Co., supra; DeKoning v. Williams,* 47 Wn.2d 139, 286 P.2d 694 (1955). He may not know, for example, that the obligation of good faith requires that the insured be kept reasonably informed of matters only if "reasonably material and significant." *See* Restatement of Restitution § 8 (1937); Restatement (Second) of Agency § 390 (1958); Restatement (Second) of Trusts § 170(2) (1959). Such matters are "likely to affect the conduct of a reasonable man . . ." *See* Restatement of Restitution § 8(2) (1937). Plaintiffs' claims of bad faith and negligence made it all the more necessary from defendant's point of view that its proposed instruction No. 9 be given. According to instruction No. 3, plaintiffs claimed that defendant failed "[t]o fully disclose the case and all of its ramifications and possibilities to the plaintiffs," and failed "to keep plaintiffs fully advised as to all developments . . ." including the $5,000 and $7,500 offers. By instruction No. 5 the court, in referring to the claims of the parties, told the jury "to consider only those matters which are established by the evidence." No instruction on the law

*Seattle v. Washington Ref. Co.,* 102 Wash. 286, 172 P. 1161 (1918); *Radburn v. Fir Tree Lumber Co.,* 83 Wash. 643, 145 P. 632 (1915); *Braden v. Rees,* 5 Wn. App. 106, 485 P.2d 995 (1971); *Kiemele v. Bryan,* 3 Wn. App. 449, 476 P.2d 141 (1970); *Meabon v. State,* 1 Wn. App. 824, 463 P.2d 789 (1970); *Nicholson v. Gibler,* 1 Wn. App. 368, 461 P.2d 900 (1969); *Broudy-Kantor Co. v. Levin,* 135 Va. 283, 116 S.E. 677, 32 A.L.R. 249 (1923).

[3]7A J. Appleman, *Insurance Law & Practice* § 4712, at 368 (Supp. 1973).

dealt specifically with the duty of disclosure, nor did any instruction inform the jury that the disclosure required was as to matters "material and significant," as distinguished from matters not meeting that requirement.

The evidence shows that Mr. Betts, as an attorney, wrote more letters and in more detailed form to defendant, a professional insurer apparently knowledgeable in the handling of personal injury claims, than he did to the laymen insureds. He wrote some letters and conferred orally with the insured concerning the litigation and expressed the opinion that this was a no-liability case, but he did not do so in the same detailed form that he did to the insurer. The jury, by instructions No. 14 and 15, was informed that good faith meant that the defendant was required to give equal weight to the interests of the insurer and the insured and, in effect, instructed that good faith would not exist if the "defendant did not give equal weight to the plaintiffs' interest." Instruction No. 15. Without proposed instruction No. 9, the jury might have believed that defendant was liable for the sum awarded if it failed to disclose to plaintiffs all the matters contained in Mr. Betts' letters to the insurer, even though the jury might have determined that some of those matters were not "material and significant." The defendant was entitled to the refused instruction in order that its theory of the case might be adequately presented in accordance with the principles discussed in *Hester v. Watson, supra,* and *Dabroe v. Rhodes Co., supra.*

Under some circumstances, a court may justify the refusal of a correct proffered instruction on the ground that its substance can be argued under other instructions given. Under other circumstances, however, the ability to argue a theory not adequately set forth in the instructions given does not eliminate the prejudice of which complaint is made. That is why it has been held that a general instruction is not necessarily adequate to present the theory of the adverse party. Were the rule otherwise, a general instruction defining negligence in terms of ordinary care would make it legally unnecessary to give proffered explanatory

instructions specific enough to enable the jury to evaluate and determine the validity of arguments advanced under the general instruction. In this case, for the reasons stated, the necessity for proposed instruction No. 9 was such that the ability to argue was no substitute for it.

Instruction No. 16 reads:

> A lawyer employed by the insurer to represent the insured owes the insured undivided loyalty. Where an insurer's attorney has reason to believe that the discharge of his duties to his client, the insured, will conflict with his duties to his employer, the insurer, it becomes incumbent upon him to terminate his relationship with the insured.

By this instruction the court in effect told the jury that the mere existence of a potential conflict of interest between the insured and the insurer at or after the appointment of the attorney to represent the parties, as impliedly permitted by the liability insurance policy, required the attorney to terminate his relationship with the insured. As the instruction reads, it would not have been enough for the attorney to have disclosed the conflict to the insured awaiting the latter's instructions on resignation. *See Reynolds v. Maramorosch,* 208 Misc. 626, 144 N.Y.S.2d 900 (1955). According to the instruction, his duty was to resign. If the instruction so given was a correct statement of the law, then an insurer could not appoint an attorney to represent both the interest of the insurer and the insured under an insurance policy provision requiring the insurance company to take over the defense of a claim against the insured because such representation involves a potential conflict of interest between the parties to the insurance policy. Likewise, no attorney could agree to act for both insurer and insured in view of the potential or actual conflict of interest. If a settlement offer was received from the claimant in an amount within the policy limits, the economic interests of the insured might call for acceptance to avoid liability for an amount in excess of policy limits, whereas the economic interests of the insurer might call for a rejection of

the offer because excessive. Nevertheless, it has long been settled that under an insurance policy provision such as exists here, which in effect is a consent in advance to the appointment of an attorney to represent both parties, it is entirely proper for the insurer to name Mr. Betts to represent the parties and for Mr. ·Betts to accept the appointment tendered to him. Upon such appointment, however, he became subject to an obligation to act in good faith to each party, and that obligation included the duty to make a fair disclosure of material facts, including settlement offers, to his client. The mere existence, actual or potential, of conflicting interests, did not, however, require that he automatically terminate his relationship. Canon 6 of the Canons of Professional Ethics, then in effect, provided, in part:

> It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

*Van Dyke v. White,* 55 Wn.2d 601, 349 P.2d 430 (1960). The agreed-to policy provision permitting the insurer to take over the defense of a claim against the insured provides the required consent that permits the attorney to represent potential or actual conflicts of interest between the insurer and the insured. *Lysick v. Walcom,* 258 Cal. App. 2d 136, 65 Cal. Rptr. 406, 28 A.L.R.3d 368 (1968), was an action for damages for defendant's alleged bad faith and negligence in the performance of his duties as an attorney representing the insurer and the insured. The insurance policy authorized the insurer to make any settlement of any claim or suit against the insured. The court first pointed out that it was proper for an attorney to be appointed by the insurer to represent the interests of the parties, saying:

> Ordinarily, there is no conflict of interest involved in such a situation because the insertion in the policy of a provision requiring the insured to permit the insurance company's lawyer to defend claims insured against amounts to a consent in advance by the insured to the

employment of an attorney by the insurance company to defend such claims. . . . Accordingly, in such cases the attorney represents two clients, the insured and the insurer, and he owes to both a high duty of care imposed by statute . . . and the rules governing professional conduct. . . . Insofar as the insured is concerned the attorney owes him the same obligations of good faith and fidelity as if he had retained the attorney personally.

. . .

It sometimes happens, while such attorney is representing both the insured and the insurer, that a conflict of interest arises between his two clients. A conflict of interest between his two clients, however, does not necessarily require that the attorney withdraw from the case or that he terminate the relationship of attorney and client with the client whose interests would prevent the attorney from devoting his entire energies in that client's behalf and to that client's interests, although he may choose to do so. In California, an attorney may usually, under minimum standards of professional ethics, represent dual interests as long as full consent and full disclosure occur.

*Lysick v. Walcom,* supra at 146.

Instruction No. 16, in requiring an automatic termination of relationship upon the existence of a potential or actual conflict of interest between the insurer and the insured, was not consistent with other instructions given by the court previously summarized. These proceeded upon the assumption that representation by the attorney for the insured and the insurer was proper subject to the performance of the obligations of good faith. The jury was even instructed that the attorney defending the claim had "no absolute duty under any and all circumstances whatever to settle the claims . . . ," and that the insurer "is not required to settle claims rather than litigate them if reasonably and in good faith the insurer believes that a bona fide issue of liability or damages exists." The instructions, therefore, permit the insurer to act under the circumstances stated even if the action is action with which the insured disagrees. I agree with the rules of law stated in *Lysick v. Walcom, supra,* above quoted, governing the duties of an attorney who represents the insured and the

insurer pursuant to an appointment made under a defense take-over provision of a policy. Instruction No. 16, therefore, does not apply here.

The instruction is apparently taken from opinion language in an Illinois case from which the court quotes in *Van Dyke v. White, supra.* Neither *Van Dyke,* the Illinois case, nor the three cases cited in the Illinois case in support of the quoted rule, deal with the jury instruction problem present here. *Lysick v. Walcom, supra,* points out that consent permits an attorney to represent conflicting interests and that prior California cases requiring an attorney to resign instead

> appear to so hold without regard to rules 6 and 7 of the California Rules of Professional Conduct approved by the Supreme Court, which rules permit representation of adverse interests after disclosure of the relation (rule 6) and with the clients' consent (rule 7).

258 Cal. App. 2d at 147 n.6. *Van Dyke v. White, supra,* does not purport to reject the legal effect of consent in accordance with the general rule. 7 Am. Jur. 2d *Attorneys at Law* §§ 154, 155 (1963).

Instruction No. 16 being erroneous, we must still determine, sua sponte if necessary, if the error assigned thereto is reviewable. *See State v. Badda,* 68 Wn.2d 50, 411 P.2d 411 (1966). Plaintiff does not claim defendant's exception to the instruction is inadequate to permit review of its propriety. Defendant excepted on the ground that

> there is simply no evidence upon which to base the instruction. . . .
> . . . [That] Betts should have withdrawn or terminated his relationship with the insured.

and that

> it's far beyond the issues in the case. There's no . . . contention or allegation made on this point.

The "no evidence" exception taken is a reviewable specific objection rather than a nonreviewable general objection. *Franks v. Department of Labor & Indus.,* 35 Wn.2d 763, 215 P.2d 416 (1950). *See also Martin v. Kidwiler,* 71 Wn.2d 47,

426 P.2d 489 (1967). This exception thus taken means that there is "(a) a complete absence of evidence of a vital fact; [or] . . . (d) the evidence establishes conclusively the opposite of the vital fact.' " *State v. Vargas,* 419 S.W.2d 926-27 (Tex. Civ. App. 1967). The vital fact necessary here to support instruction No. 16 was the absence of consent to the legal representation by Betts of insurer and insured notwithstanding the existence of a potential conflict of interest between them. The conclusive evidence showed the presence of consent in the form of the defense take-over provision of the insurer's policy in evidence. Accordingly, "there was no evidence" to support the instruction. The jury nevertheless were permitted to find thereunder that, in the language of the exception, "Betts should have withdrawn or terminated his relationship with the insured." The prejudice sustained thereby appears in the following discussion of the second ground permitting review.

If defendant's exception was insufficient under CR 51(f), the assignment of error is nevertheless reviewable under the "obvious and manifest injustice" exception. An appellate court may review an error notwithstanding the absence of an adequate exception if the error committed creates an obvious and manifest injustice. *See State v. Peterson,* 73 Wn.2d 303, 438 P.2d 183 (1968); *State v. Louie,* 68 Wn.2d 304, 413 P.2d 7 (1966); *State v. Suleski,* 67 Wn.2d 45, 406 P.2d 613 (1965). A similar rule prevails in the federal courts under Fed. R. Civ. P. 51, from which CR 51 is taken. *Choy v. Bouchelle,* 436 F.2d 319 (3d Cir. 1970); *Paluch v. Erie Lackawanna R.R.,* 387 F.2d 996 (3d Cir. 1968); *O'Brien v. Willys Motors, Inc.,* 385 F.2d 163 (6th Cir. 1967); 5A J. Moore, *Federal Practice* ¶ 51.04, at 2515 (2d ed. 1971).

The facts here are somewhat unusual. Mr. Betts' credibility was a vital issue in the case. He was defendant's sole witness concerning defendant's representation of the plaintiffs' interests and his disclosure to plaintiffs of the settlement offers which they claimed had not been disclosed. Plaintiffs were contending that Mr. Betts was unlawfully representing conflicting interests and thereby violating pro-

fessional and ethical standards of the legal profession to which he was subject. Defendant had been denied the benefit of instruction No. 9 which, had it been given, would have enabled the jury to more fairly evaluate Mr. Betts' performance as a lawyer, including his duty to act in good faith. Once instruction No. 16 was given, erroneous because it ignored the legal effect of consent to the legal representation here, the jury might have concluded Mr. Betts' credibility was so impaired as to make a verdict against defendant inevitable. The law requires that all trials be fair to all parties, plaintiff or defendant. In view of the requirement of a fair trial, refusal to review the assignment of error made to instruction No. 16 would constitute an obvious and manifest injustice.

I find no reversible error in the remaining assignments of error. The instructions given, except for instruction No. 16, are not vulnerable to the objections defendant raised to them. The remaining instructions refused and assigned as error are either sufficiently covered by the general instructions or there is no manifest abuse of discretion in refusing the requested instructions, or the requested instructions are incorrect. Defendant's motion to strike the entire testimony of one of the two lawyer witnesses for the plaintiffs was overbroad. The basis advanced for the motion was that the witness merely testified to his disagreement with Mr. Betts' evaluation of the claim against the insured, and that such testimony was inadmissable without a showing that Mr. Betts' evaluation was arrived at in a manner contrary to the applicable standard of attorneys practicing in this state. *Cook, Flanagan & Berst v. Clausing,* 73 Wn.2d 393, 438 P.2d 865 (1968); *Lysick v. Walcom,* 258 Cal. App. 2d 136, 65 Cal. Rptr. 406, 28 A.L.R.3d 368 (1968). Had the motion been granted, however, the witness' further and admissible testimony concerning the duty of an attorney to his client would have been erroneously stricken.

I would reverse the judgment.

Petition for rehearing denied September 18, 1973.

Review granted by Supreme Court November 7, 1973.